E-FILED
Friday, 19 March, 2010  04:22:25 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

WILLIAM A. FRIZZELL,      )
                             )
          Plaintiff,     )
                             )
         v.          )     No. 07-CV-3181
                             )
MICHAEL ASTRUE,       )
Commissioner of Social Security,  )
                             )
         Defendant.   )

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff William Frizzell appeals from a final decision of the Social Security Administration (SSA) denying his application for Disability Insurance Benefits (DIB)  under the Social Security Act, 42 U.S.C. §§ 416(I) and 423, for the period from July 30, 2004 forward.  Frizzell brings this appeal pursuant to 42 U.S.C. § 405(g).  The parties have consented to a determination of this case by a United States Magistrate Judge, pursuant to 28 U.S.C. § 636.  Order, January 16, 2009 (d/e 16).  The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule 8.1(D).  Motion for Summary Judgment by Plaintiff William A. Frizzell (d/e 17); Motion for Summary Judgment by Defendant Commissioner of Social Security (d/e 19).  Frizzell has also filed a Reply (d/e 21) on June 8,

2009, which the Court will consider in making its ruling.  For the reasons set forth below, the SSA's Motion for Summary Judgment is denied, Frizzell's Motion for Summary Judgment is allowed, and the matter is remanded to the SSA pursuant to Sentence 4 of 42 U.S.C. § 405(g) for further proceedings.

## STATEMENT OF FACTS

A.    Medical History

Frizzell was born May 14, 1965.  He graduated from high school, but reads at a 6th grade level according to a vocational and psychological evaluation from 2005.  Administrative Record (d/e 14) (A.R.) at 161.  He is married and has three young daughters.  Frizzell has past relevant work as a gas station attendant, car wash attendant, and shop person in a tire recycling facility.  On October 17, 2002, Frizzell lost his dominant left arm in an accident at his workplace.  Frizzell's left arm was pulled into a conveyor belt machine at the tire recycling facility and severed at the shoulder.

Following the accident, Frizzell was treated at St. John's Hospital in Springfield, Illinois.  A.R. at 125.  Doctors determined that Frizzell's arm could not be saved, and a total amputation of the arm was performed.  A.R. at 121-24.  Frizzell returned to work after the amputation, using only his

right arm.  In March 2003, Frizzell saw Dr. Stephen Milner, who noted that
Frizzell had obtained a prosthesis.  Dr. Milner noted that Frizzell was very
enthusiastic and "demonstrated a remarkable dexterity of his left arm and
hand."  A.R. at 104.  Dr. Milner noted that Frizzell had returned to work with
some restrictions on his left arm, but otherwise was doing very well.
Frizzell saw Dr. Milner again in January 2004.  A.R. at 103.  Dr. Milner
noted that Frizzell "has made an amazing recovery with his left arm and he
is extremely comfortable with prosthesis."  Id.  Frizzell complained that his
increased mobility was achieved at the expense of some degree of
discomfort in his left arm area.  Dr. Milner advised Frizzell to continue with
mobilization exercises, noting that surgery was not warranted.  Dr. Milner
noted that Frizzell was taking Neurontin and Vicodin for pain which helped
"somewhat but not completely."  Id.

Frizzell quit work in June 2004.  He saw Dr. Milner in July 2004,
complaining of occasional neuropathic pain from the amputation stump and
some phantom pain.  A.R. at 102.  Frizzell declined treatment.  Dr. Milner
noted that Frizzell was coping reasonably well with the prosthesis, although
it was very uncomfortable at times.  Dr. Milner ordered follow up in six
months.  Frizzell applied for DIB in November 2004.

On January 10, 2005, Frizzell was examined by Dr. Paul Nord, a family practice physician.  A.R. at 127-29.  Frizzell reported constant pain at the amputation site, which he described as "a burning, shocking type pain," as well as phantom pain.  A.R. at 128.  Frizzell told Dr. Nord that he had spoken with other doctors regarding surgery, but was informed that, if he were to have further surgery, he could experience other phantom pain.  Frizzell reported a tight feeling in the axillary area left arm that worsened with movement, lifting, and cool damp weather.  Frizzell also reported some pain in his right shoulder, especially with lifting.  Frizzell stated that he stayed home and took care of his children, ages 8, 5, and 1.  Frizzell reported that he had learned to print with his right hand.

On examination, Dr. Nord noted a full range of motion in Frizzell's right shoulder and good strength.  There was some crepitations, or popping, with rotation of the right shoulder.  Frizzell reported that he rarely used his prosthesis because he occasionally experienced muscle spasms in the left shoulder area which caused the prosthesis to abduct and strike him in the chest or toward his head area.  Dr. Nord also reviewed medical records.

Dr. Nord concluded that Frizzell had sustained a chronic strain of the right upper arm and some mild arthritis.  Dr. Nord felt that Frizzell could use his right arm for sedentary duties, but should be limited from doing any work above the nipple line with his right arm.  Dr. Nord opined that the phantom pain would continue and may or may not improve.

On January 18, 2005, a residual functional capacity assessment was completed by state agency medical consultant Madala Vidya.  A.R. at 130-37.  According to the assessment, Frizzell could lift ten pounds occasionally and less than ten pounds frequently.  He was limited in his ability to push and pull with his upper extremities, as well as in reaching, handling, fingering, and feeling.  Vidya noted that Frizzell was doing reasonably well with his prosthesis and was not very limited in activities of daily life.  On April 6, 2005, Arjmand Towfig affirmed the January 18, 2005 assessment as written.  A.R. at 138.

Frizzell saw Dr. Christopher Wottowa for treatment of his right shoulder.  On May 19, 2005, Dr. Wottowa noted that Frizzell had been experiencing pain in his right shoulder and wrist for about a year.  A.R. at 156.  Frizzell did not report any numbness or tingling in his hand, but did report numbness shooting down from his arm towards his wrist.  According

to Dr. Wottowa, Frizzell was not taking any medications at the time.  Dr. Wottowa noted full range of motion in Frizzell's right shoulder with positive impingement signs.  Dr. Wottowa believed that Frizzell had a ganglion cyst on his right wrist, but recommended no treatment unless symptoms appeared.  Dr. Wottowa also noted rotator cuff tendonitis on the right side. Dr. Wottowa recommended aggressive treatment, due to the fact that Frizzell had only one upper extremity.  Dr. Wottowa administered an injection and referred Frizzell to therapy.  Frizzell attended therapy from June 24, 2005 through July 15, 2005.  A.R. at 142-55.  By July 15, 2005, Frizzell reported a 95% decrease in overall pain since the start of physical therapy.  A.R. at 142.  The physical therapist noted that Frizzell had met all long-term and short-term goals of therapy.  Id.

Frizzell followed up with Dr. Wottowa on July 21, 2005.  A.R. at 139. Dr. Wottowa noted that Frizzell had made great progress and his pain was at a very tolerable level.  Dr. Wottowa noted clicking, popping, and pain at the superior angle of Frizzell's right scapula.  Frizzell reported some muscle spasms in the superomedial border of the scapula.  Frizzell had a full range of motion in his right shoulder.  Dr. Wottowa released Frizzell to

all activities with no restrictions, but advised him to continue strengthening exercises for his right shoulder every day.

Dr. Samuel Bernstein, Ph.D., conducted a vocational and psychological evaluation of Frizzell, dated July 25, 2005.  A.R. at 157-62. Dr. Bernstein noted that Frizzell came to the evaluation wearing his prosthesis, but had to remove it during the course of the interview due to pain.  Frizzell informed Dr. Bernstein that he had pain in what remained of his left shoulder, and he grimaced frequently during the evaluation.  Frizzell told Dr. Bernstein that the prosthesis occasionally made his pain worse and he had to remove it as much as three to five times a day in an effort to relieve the pain and muscle spasms.  Frizzell reported that he had trouble sleeping at night and felt tired during the day.  Dr. Bernstein characterized Frizzell as anxious and noted that Frizzell had some concentration problems, particularly when in intense pain.  Frizzell reported that he felt worthless, like "half a man."  A.R. at 158.  Frizzell reported thoughts of suicide once or twice a week.  Frizzell stated that he felt hopeless about his medical situation and his future.  Frizzell did not want to go out of the house and avoided crowds.  He was conscious about the way he looked without his left arm and did not want people to stare at him.  Frizzell

reported feeling frustrated and inferior and admitted to crying during the week.  Frizzell also reported feeling irritable, nervous, and anxious and being easily aggravated.  Frizzell reported recurring thoughts of the accident on a weekly basis.  Frizzell was not on any type of pain medication at the time of Dr. Bernstein's evaluation.

Dr. Bernstein characterized Frizzell's main problem as constant pain on the left side with muscle spasms and pain with use of the upper right extremity.  Dr. Bernstein noted that Frizzell had developed signs of major depression and post-traumatic stress disorder.  However, Dr. Bernstein characterized Frizzell's major work impairment as his unskilled background coupled with the very limited use of both upper extremities.  A.R. at 161. Dr. Bernstein opined that Frizzell was unemployable in the open competitive labor market.

Frizzell saw Dr. Kenneth Sagins, a primary care provider, on a continuing basis.  In December 2005, Dr. Sagins noted a history of amputation with increasing left shoulder pain.[1]  A.R. at 192-93.  Dr. Sagins recommended an orthopedic visit or a pain specialist, but Frizzell declined. In March 2006, Frizzell reported that his left shoulder was giving him some

---

[1]The Court notes Dr. Sagins' notes from 2005 and 2006 are redacted in part. The notes have been stamped "BEST COPY OBTAINABLE."

trouble again and that Flexeril one time daily was not helping anymore. A.R. at 190.  Dr. Sagins noted that Frizzell's problem was his shoulder and prescribed Flexeril three times a day.  A.R. at 187, 190.  Dr. Sagins also noted that the settlement from Frizzell's accident was going to come in the next month, which would help financially, and take a weight off of Frizzell.

Frizzell returned to Dr. Sagins in July 2006.  A.R. at 185-86.  Dr. Sagins noted that Frizzell's mood was good and that the settlement was completed.  The settlement was almost a million dollars, but Frizzell netted less than half after attorney's fees and repaying worker's compensation in part.  Frizzell bought a house and put the rest of the money aside.  He reported feeling much better because of this, although he was still angry at times.  Dr. Sagins characterized Frizzell's only problems as smoking and left shoulder problems including muscle spasms and cramps which were characterized as "somewhat uncomfortable."  A.R. at 186.  Upon examination, Dr. Sagins reported observing an involuntary spasm in Frizzell's left shoulder which seemed to give Frizzell "a little bit of discomfort."  Id.  Dr. Sagins noted that Frizzell was feeling a lot better about things overall and had no suicidal or homicidal ideation.

Frizzell returned to Dr. Sagins for follow up on December 4, 2006. A.R. at 182-83.  Dr. Sagins noted that Frizzell's mood had been up and down and he continued to experience discomfort in his left shoulder.  A.R. at 183.  Dr. Sagins noted mild tenderness in the left shoulder and referred Frizzell for follow up with Dr. Wottowa.

In January 2007, Frizzell underwent a neurological evaluation with Dr. Claude Fortin, on a referral from Dr. Wottowa.  A.R. at 283.  Dr. Fortin noted that Frizzell had been experiencing severe phantom pain since his accident.  The pain was described as a knife-like sensation, a persistent ache, and uncomfortable feeling and a constant twitching of the left shoulder.  Dr. Fortin suggested a nerve block, to which Frizzell agreed.

Frizzell followed up with Dr. Fortin on May 7 and May 22, 2007.  A.R. at 280-82.  Dr. Fortin noted significant improvement in Frizzell's phantom pain with Cymbalta.  Frizzell reported that he was no longer having any of the electrical sensations.  A.R. at 280.  Dr. Fortin also noted that muscle spasms were still problematic despite use of a muscle relaxant.

In July 2007, Dr. Fortin noted that Cymbalta was working very well for Frizzell's phantom pain and he was tolerating it well.  A.R. at 278.  Frizzell

did complain of some neck, shoulder and thoracic pain, but reported that he continued to participate in all of his usual daily activities.

Also in July 2007, Frizzell began treatment with Ray Redick, Psy.D. A.R. at 285. According to Dr. Redick, Frizzell presented with severe depressive symptoms due to his medical condition, but reported no suicidal thoughts. A.R. at 286. Dr. Redick diagnosed Frizzell as suffering from mood disorder due to left arm amputation/right arm tendonitis. Dr. Redick assigned Frizzell a GAF score of 50.[2] A.R. at 288. Dr. Redick recommended outpatient therapy. Frizzell attended four counseling sessions from July 30, 2007 through December 3, 2007. On December 11, 2007, Dr. Redick opined that Frizzell was not able to work . A.R. at 285.

In August 2007, Frizzell saw Dr. Sagins. A.R. at 266. Frizzell reported that, for two months he had been experiencing pain in his right arm, from his elbow to his hand that causes tingling and pain. Frizzell stated that certain movements, including lifting and shifting gears, cause significant pain. Dr. Sagins noted a 5/5 grip strength and no muscle

---

[2]GAF is an assessment of an individual's overall level of psychological, social and occupational functioning which is used to make treatment decisions. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32 (4th ed.2000). Scores range from 0 to 100, with lower numbers indicating more severe mental limitations. Id. at 34.

wasting.  Dr. Sagins impression was cubital tunnel syndrome.  He referred

Frizzell to Dr. Wottowa for further evaluation.

On September 27, 2007, Frizzell saw Dr. Fortin.  A.R. at 276-77.

Frizzell reported that the Cymbalta was working fairly well and that he was

sleeping better at night.  Dr. Fortin characterized Frizzell's phantom pain as

stable with Cymbalta.  However, Frizzell began complaining of upper right

extremity symptoms, including numbness and tingling and reported that he

would be seeing Dr. Wottowa about this.  On September 28, 2007, Frizzell

returned to Dr. Sagins.  A.R. at 264.  Dr. Sagins noted that Frizzell's

phantom pain seemed to be a little bit better, due to Cymbalta and

Robaxin, and his moods were okay.  Frizzell saw Dr. Wottowa on October

4, 2007, complaining of problems using his right hand for approximately

three weeks.  A.R. at 275.  Dr. Wottowa noted a full range of motion in

Frizzell's right shoulder, elbow, forearm, wrist, and fingers.  Frizzell

exhibited normal strength.  Dr. Wottowa concluded that Frizzell was getting

some early carpal tunnel syndrome and perhaps even some cubital tunnel

syndrome.  He directed Frizzell to take anti-inflammatories for two months

and wear a wrist brace at night.

B.    Administrative Proceedings

Frizzell filed his application for DIB on November 28, 2004, with an alleged onset date of July 30, 2004.  His claim was denied initially and on reconsideration.  Frizzell requested an administrative hearing, which was held January 29, 2007.  On February 9, 2007, the Administrative Law Judge (ALJ) issued an opinion denying Frizzell's request for DIB.  A.R. at 12-19.  The Appeals Council denied Frizzell's request for review on May 25, 2007.  A.R. at 4-6.  Frizzell then filed his Complaint (d/e 1) in the instant action.  The Commissioner moved for remand pursuant to sentence six of 42 U.S.C. Section 405(g), when the tape recording of the January 29, 2007 hearing could not be located.  United States District Judge Jeanne Scott allowed the motion to remand, directing that the case be remanded to the Commissioner to reconstruct the missing file.  Text Order, dated September 20, 2007.

Following remand, the ALJ held another hearing on December 18, 2007.  A.R. at 303-342.  At this hearing, the ALJ heard testimony from Frizzell, his wife Kimberly Frizzell, and vocational expert James Lanier.  Frizzell testified that he was married and had three young children.  Frizzell stated that the family lived in a two story home with a basement.  When

asked whether he could read and write in the English language, Frizzell replied "Somewhat."  A.R. at 311.  Frizzell explained that he could write his name with his right hand, but other than that, he did not write because he would get cramps in his fingers.  A.R. at 329.

Frizzell testified that, after the accident that severed his arm, he returned to work at the tire recycling facility.  Frizzell explained that, prior to the accident, his job at the recycling facility was to keep everything running. He would change blades, weighing about 175 pounds a piece, on machines and grease machines.  Occasionally, he would be sent out with a truck to pick up tires.  Frizzell stated that, after the accident, he was not able to handle the blades one-handed.  According to Frizzell, when he returned to work following the accident, he answered the phone and took messages for three months.  Then he would help load and unload trucks full of tires and clean the shop, bathroom, lounge area and office.  Frizzell testified that he stopped working in June 2004 because he started having real problems with his right arm and shoulder.  A.R. at 311.

Frizzell testified that he was taking five medications, listed at A.R. 260.  A.R. at 312.  Frizzell testified that the effectiveness of his medication varied.  Frizzell explained that he still experienced phantom pain in his left

side and that as he understood it, he would continue to experience this pain for the rest of his life. Frizzell stated that the medications made him drowsy.

Frizzell testified that he had a prosthetic arm, but found it "a pain to wear." A.R. at 314. Frizzell stated that he could not pick up a coin off a table with his right hand and that his right arm would hurt if he carried something heavy. Frizzell testified that sometimes it would hurt his right arm to carry a gallon of milk, although he stated that he could occasionally carry twenty pounds with his right arm. Frizzell explained that when he tried to push or pull he experienced pain from his right shoulder down to his hand.

When asked about his depression, Frizzell stated that he was unable to do things that he liked because of the loss of his arm and this made him depressed. A.R. at 318. Frizzell testified that he was an easygoing guy before the accident, but, after the accident, he was easily angered. Frizzell also stated that it was hard for him to focus.

Frizzell testified that he did not do yard work or gardening and that he did very little repair work. Although Frizzell has a driver's license, he testified that his wife drove him to the hearing. Frizzell estimated that he

drove less than twenty-five miles a week.  He stated that he had not found any hobbies he could do post-accident.

Frizzell testified that, for the most part, he was able to take care of his personal hygiene; however, if his right arm was dirty, his wife would clean it.  He also stated that every once in a while it would bother his wrist to shave.  Frizzell testified that he would go to a buddy's house almost every night, but he did not like being out in crowds.  He stated that he did not belong to any clubs or organizations and did not attend church.  Frizzell would watch up to four hours of television while at his buddy's house. Frizzell testified that he did not do any reading.

With respect to household activities, Frizzell stated that he could do some cooking prep work, but could not stir a pot on the stove.  He testified that he did not do the laundry or grocery shopping and he was messy when doing the dishes.  According to Frizzell, his wife handled the family's finances.

Frizzell testified that he experienced numbness and tingling in his right arm every day and, depending on the weather, he could experience it five to ten times a day.  According to Frizzell, the numbness and tingling prevented him from playing sports and doing things around the home.

Frizzell stated that, sometimes when his arm or fingers were numb, he would drop his fork or spoon while eating a meal. Frizzell testified that, after the accident, he could still work on his cars a little, but that it took him twice as long to do so and he had to take quite a few breaks.

Frizzell testified that he took two to three naps a day, ranging in duration from fifteen minutes up to an hour. Frizzell also stated that his doctor gave him a brace for his right hand that he wore every night when he went to bed to keep his wrist stable. Frizzell testified that the brace seemed to help and he would sometimes wear it during the day if his wrist started bothering him. Frizzell stated that he experienced pain in his left should area that felt like an electrical shock approximately fifteen times a day, correlated to activity. According to Frizzell, medication helped his left shoulder area "[s]omewhat," depending on the weather and the temperature. A.R. at 327. Frizzell explained that five to ten times a day, pain from his right arm would "transfer" to his left. A.R. at 328. Frizzell further stated that he did not feel like doing anything three or four days out of a week and that he had problems sleeping. According to Frizzell, he is lucky to get four hours of sleep a night because he has problems getting

comfortable and keeping his arm in a position where it does not hurt. Frizzell testified that he was trying to stop smoking with some success.

Frizzell's wife Kimberly also testified.  Kimberly stated that she and Frizzell had been married for fifteen years.  Kimberly testified that, since the accident, Frizzell does not do as much as he used to do.  She stated that things take longer for him to complete and he sometimes ends up in pain after trying to do things that he probably should not be doing. Kimberly stated that Frizzell's right arm always bothers him and that she can gauge his pain by looking at his face.  Kimberly also stated that there was always pain in Frizzell's left arm, but when the weather turned colder, the pain increased.  According to Kimberly, since the onset of carpal tunnel syndrome, Frizzell did not do much with his right arm.  However, she stated that Frizzell would do what he has to do, including taking the children to school and picking them up.

When asked about Frizzell's mood and depression, Kimberly testified that "he was crazy there for a while," but with Cymbalta (pain medication) his mood had "kind of leveled out."  A.R. at 333.  She explained that, when he was in a lot of pain, Frizzell's mood was worse than on a good day.  She also believed that talking to Dr. Redick helped keep Frizzell more level.

She noted, however, that there is only so much that interests Frizzell that he can do after the accident.

Vocational expert Lanier testified that an individual of Frizzell's age, education, and experience who was limited to unskilled, light work, the use of only his non-dominant hand, and only occasional contact with the public, coworkers, and supervisors would be unable to perform Frizzell's past relevant work. The ALJ asked whether there would be other jobs in the economy that such an individual could perform. Dr. Lanier replied that there would be some jobs, but that they would be limited in number due to the restriction on contact with the public, coworkers, and supervisors. Dr. Lanier identified surveillance system monitor, office messenger/helper clerk, and circuit board screener as possible jobs. On examination by Frizzell's attorney, Dr. Lanier testified that, based on Dictionary of Occupational Title (DOT) listings, the surveillance system monitor and circuit board screener positions require frequent use of the hands. However, Dr. Lanier stated that, in his experience based on observation, those two positions require only occasional use of the hands. Dr. Lanier testified that the office messenger/helper clerk position required frequent use of the hands.

On January 15, 2008, the ALJ issued a written decision, concluding
that Frizzell had not been under a disability within the meaning of the
Social Security Act from July 30, 2004 through the date of the decision.
A.R. at 206-14.  The Appeals Council denied review, and the decision of
the ALJ became the final decision of the SAA.  A.R. at 196-96A.  By text
order, dated January 7, 2009, Judge Scott reinstated Frizzell's 2007 case.
The parties subsequently consented to a determination of the case by this
judge.

C.    The ALJ's Decision dated January 15, 2008

At issue in the present case is the ALJ's decision dated January 15,
2008; thus, the Court addresses it in detail.  See A.R. at 206-14.  In
reaching the conclusion that Frizzell was not disabled, the ALJ followed the
five-step analysis set out in 20 C.F.R. § 404.1520.  The analysis requires a
sequential evaluation of (1) whether claimant is engaged in substantial
gainful activity; (2) the severity and duration of claimant's impairment; (3)
whether the impairment equals a listed impairment in 20 C.F.R. Pt. 404,
Subpart P, Appendix 1; (4) whether the impairment prevents claimant from
doing his past relevant work; and (5) whether claimant can perform other
work, given his residual functional capacity, age, education, and work

experience.  20 C.F.R. § 404.1520(a)(4).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

SSA has the burden on the last step; the SSA must show that, considering

the listed factors, the claimant can perform some type of gainful

employment that exists in the national economy.  Young v. Barnhart, 362

F.3d 995, 1000 (7th Cir. 2004).

The ALJ determined that Frizzell met his burden on the first two steps

of the analysis.  Specifically, the ALJ found that Frizzell had not engaged in

substantial gainful activity since July 30, 2004 and that he had "the

following severe combination of impairments: residuals from a left arm

amputation, right arm tendonitis, and depression."  A.R. at 208.  At step

three, the ALJ concluded that Frizzell's impairments were not severe

enough to equal an impairment listed on Appendix 1.  A.R. at 208-09.  In

doing so, the ALJ expressly considered Listing 1.05 for amputation and

Listing 12.04 for depression.  Id.

The ALJ then considered whether Frizzell retained the residual

functional capacity (RFC) to perform his past relevant work (step four) or

other work existing in significant numbers in the national economy (step

five).  The ALJ concluded that Frizzell retained the RFC to perform light

work, with the following restrictions: (1) Frizzell cannot lift more than twenty pounds maximum and ten pounds frequently; (2) he has use of only his right, non-dominant arm; (3) he is limited to simple tasks with one and two step instructions; and (4) he can have only occasional contact with the public, co-workers, and supervisors.  A.R. at 209.

At step four, the ALJ found that, given his RFC, Frizzell was unable to perform his past relevant work as a gas station attendant, car wash attendant and shop person for tire recycling.  A.R. at 213.  Thus, the ALJ correctly shifted the burden to the Commissioner to show that Frizzell retained the residual functional capacity to perform other work existing in significant numbers in the national.  Id.  Based on the vocational expert's testimony, the ALJ determined that Frizzell could work as a surveillance system monitor, an office messenger/helper clerk, or a circuit board screener, positions that the ALJ determined existed in significant numbers in the national economy.  A.R. at 214.  Thus, the ALJ deemed Frizzell to be "not disabled" at step five.

<u>ANALYSIS</u>

This Court will reverse the decision of the SSA if that decision is not supported by substantial evidence or results from an error of law.  Lopez v.

Barnhart, 336 F.3d 535, 539 (7th Cir. 2003). This Court reviews the ALJ's

factual findings to determine whether they are supported by substantial

evidence. Substantial evidence is, "such relevant evidence as a

reasonable mind might accept as adequate" to support the decision.

Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept

the ALJ's findings if they are supported by substantial evidence and may

not substitute its judgment for that of the ALJ. Delgado v. Bowen, 782 F.2d

79, 82 (7th Cir. 1986). The issue before this Court is whether the ALJ's

findings were supported by substantial evidence and not whether Frizzell is

disabled. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003). The ALJ

must at least minimally articulate his analysis of all relevant evidence.

Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The Court must be

able to "track" the analysis to determine whether the ALJ considered all the

important evidence. Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

This Court must not reweigh the evidence and should affirm as long as the

ALJ "identifies supporting evidence in the record and builds a logical

bridge from that evidence to the conclusion." Giles ex rel. Giles v. Astrue,

483 F.3d 483, 486 (7th Cir. 2007). If, however, "the ALJ's decision lacks

evidentiary support or is so poorly articulated as to prevent meaningful

review, the case must be remanded." Id. (internal quotations and citation omitted).

Frizzell seeks reversal of the SAA's decision, arguing that (1) the ALJ erred in failing to consider the effects of all of his impairments in determining his RFC; (2) the ALJ erred in relying on the vocational expert's testimony at step five of the analysis; (3) the ALJ erred in his determination that Frizzell was not entirely credible; and (4) the ALJ's decision is not supported by substantial evidence.

1.  RFC Assessment

Frizzell asserts that the ALJ erroneously failed to consider all of his impairments in determining that he retained the RFC to perform light work, with the following restrictions: (1) cannot lift more than twenty pounds maximum and ten pounds frequently; (2) has use of only his right, non-dominant arm; (3) is limited to simple tasks with one and two step instructions; and (4) can have only occasional contact with the public, co-workers, and supervisors.  Specifically, Frizzell argues that the ALJ failed to consider his phantom pain, his right arm tendonitis, his severe depression, his back pain, and his carpal tunnel syndrome, including limitations on manipulation.  This argument is unpersuasive.

The ALJ expressly considered Frizzell's phantom pain, noting that it was improved with medication.  A.R. at 212.  This determination is consistent with the medical evidence, specifically Dr. Fortin's notes from 2007.  A.R. at 276-83.  With respect to Frizzell's right shoulder tendonitis, the ALJ noted the positive report following physical therapy in June and July 2005.  A.R. at 142, 211.  The ALJ also noted that Dr. Wottowa, who was treating Frizzell for the tendonitis, released Frizzell to all activities with no restrictions in July 2005.   A.R. at 139, 211.  The medical evidence does not support a finding that Frizzell's right shoulder tendonitis would necessitate limitations in his RFC following this date.  While Frizzell asserts that his collective pain resulted in lapses in concentration, this is not supported by the record evidence.  The only evidence of diminished concentration in the medical records comes from statements Frizzell made to Dr. Bernstein in 2005.  Additionally, Dr. Redick's mental status evaluation from July 2007 notes that Frizzell displayed adequate attention and concentration.  A.R. at 289.  In assessing Frizzell's RFC, the ALJ concluded that Frizzell is limited to simple tasks with one and two step instructions.  The ALJ did not err in failing to include additional limitations on concentration in Frizzell's RFC.

Similarly, the ALJ did not err in failing to include limitations based on back pain or carpal tunnel syndrome.  The ALJ correctly noted that the record did not contain evidence of on-going complaints or treatment for back pain.  A.R. at 212.  Additionally, the ALJ considered Frizzell's carpal tunnel syndrome, noting that there was no evidence that it would last more than twelve months.  A.R. at 212.  This finding is supported by the record evidence; furthermore, the record is devoid of medical evidence of limitations resulting from carpal tunnel syndrome.

Finally, the ALJ expressly considered Frizzell's depression, noting that he was treated for depression with good success.  A.R. at 212.  The ALJ correctly recognized that there is no evidence to support a finding that depression limited Frizzell's ability to perform daily activities, function socially, or concentrate.  In assessing Frizzell's RFC, the ALJ determined that Frizzell can have only occasional contact with the public, co-workers, and supervisors.  This restriction is consistent with Frizzell's testimony that he is easily angered and dislikes crowds, but could interact with friends and family.  Frizzell fails to identify any other possible limitation arising out of depression. Frizzell's claim of error fails.  The ALJ's RFC assessment is supported by the record evidence.

2.  Step Five Analysis

Frizzell contends that the ALJ committed reversible error at step five because the ALJ presented a flawed hypothetical and the vocational expert gave unreliable testimony.  As the Commissioner concedes, there was a disparity between the hypothetical presented to the vocational expert and the RFC as ultimately determined by the ALJ in his January 15, 2008 order. The ALJ asked the vocational expert to consider an individual of Frizzell's age, education, and experience who was limited to unskilled, light work, the use of only his non-dominant hand, and only occasional contact with the public, coworkers, and supervisors.  A.R. at 335-36.  In rendering his order, the ALJ concluded that Frizzell retained the RFC to perform light work, with the following restrictions: (1) Frizzell cannot lift more than twenty pounds maximum and ten pounds frequently; (2) he has use of only his right, non-dominant arm; (3) he is limited to simple tasks with one and two step instructions; and (4) he can have only occasional contact with the public, co-workers, and supervisors.  A.R. at 209.

The term "unskilled work" is not synonymous with a limitation to simple tasks with one and two step instructions.  Unskilled work

corresponds to a special vocational preparation (SVP)[3] of 1 or 2 and is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a).  Additionally, while the Commissioner argues that the DOT supports a finding that the surveillance system monitor and circuit board screener positions require no more than simple tasks with one and two step instructions because they are rated SVP 2, it is clear that the vocational expert based his recommendation of these positions on his personal observations and not on the positions as described in the DOT. A.R. 338-39. Thus, the ALJ's determination that Frizzell could perform the surveillance system monitor and circuit board screener positions with the RFC as stated in the decision lacks evidentiary support.  Therefore, the decision dated January 15, 2008 must be reversed.

Given this determination, the Court does not reach Frizzell's argument that the vocational expert's testimony was unreliable because it conflicted with the DOT or consider any error resulting from the ALJ's mischaracterization of Dr. Lanier's testimony as consistent with the DOT

---

[3]SVP is a classification system that measures the length of time required to learn the skills necessary to perform a given job.  SVP 1 is described as "short demonstration only," while SVP 2 is "anything beyond short demonstration up to and including 1 month."  DOT, Appendix C.

without exception.  See A.R. at 214.  However, on remand, the ALJ should

be cognizant of his duty to explore any potential conflicts between the

vocational expert's testimony and the DOT to ensure that the requirements

of any identified jobs are consistent with Frizzell's abilities.  See Craft v.

Astrue, 539 F.3d 668, 681 (7th Cir. 2008).

    3.  Credibility Determination

    Frizzell asserts that the ALJ erred in assessing his credibility by

misstating Frizzell's testimony.  In making his determination, the ALJ found

that Frizzell's statements concerning the intensity, persistence, and limiting

effects of his symptoms were not entirely credible.  An ALJ is in the best

position to determine the credibility of witnesses; therefore, this Court must

afford the ALJ's credibility determinations considerable deference,

overturning them only if they are "patently wrong."  Craft, 539 F.3d at 678.

In the instant case, the ALJ properly presented specific reasons for his

adverse credibility determination, noting Frizzell's reported activities and

the contrary medical evidence.  See id.  Contrary to Frizzell's assertions,

the ALJ did not misstate Frizzell's testimony.  The ALJ clearly identified

certain testimony, including an ability to push and pull, as coming from the

January 29, 2007 hearing.  A.R. at 209-10.  The ALJ then went on to

identify other testimony as coming from the December 2007 "supplemental" hearing.  A.R. at 210.  There is nothing in the record to indicate that the ALJ's failure to fully credit Frizzell's testimony was patently wrong.

CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment by Plaintiff William A. Frizzell (d/e 17) is ALLOWED, and the Motion for Summary Judgment by Defendant Commissioner of Social Security (d/e 19) is DENIED.  Judgment is entered in favor of Frizzell and against the Commissioner.  Frizzell asks the Court to direct an award of benefits. The Court has the power to enter, upon the pleadings and transcript of the record, a judgment reversing the decision of the Commissioner, "with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court need not remand a case "when no useful purpose would be served by further administrative proceedings, or when the record has been fully developed and there is not sufficient evidence to support the ALJ's conclusion."  Holden v. Shalala, 846 F.Supp. 662, 669-70 (N.D. Ill. 1994)(internal citations omitted).  However, in the instant case, the record is not fully developed, as set forth above, and an outright award of benefits in not appropriate.

THEREFORE, the Commissioner's Decision is REVERSED, and the matter is REMANDED to the Social Security Administration pursuant to Sentence 4 of 42 U.S.C. § 405(g) for further proceedings consistent with the criteria discussed above.  All pending motions are denied as moot. THIS CASE IS CLOSED.

IT IS THEREFORE SO ORDERED.

ENTER:     March 19, 2010.

FOR THE COURT:

*s/ Byron G. Cudmore*
_____
BYRON G. CUDMORE
UNITED STATE MAGISTRATE JUDGE